UNITED STATES DISTRICT COURT DISTRICT OF MARYLAND
Northern Division

---

NAOMI SHENEMAN,

    Plaintiff,

v.

ANNE ARUNDEL MEDICAL CENTER, INC.

ANNE ARUNDEL MEDICAL CENTER
COLLABORATIVE CARE NETWORK, LLC,

and

ANNE ARUNDEL MEDICAL CENTER
FOUNDATION, INC.

2001 Medical Parkway
Annapolis, Maryland 21401

<u>Serve on Resident Agent</u>
The Corporation Trust Incorporated
2405 York Road, Suite 201
Lutherville, Maryland 21093-2264

    Defendants.[1]

Case No. 1:17-cv-3812

JURY TRIAL DEMANDED

---

**COMPLAINT**

Plaintiff, NAOMI SHENEMAN, by and through her undersigned counsel, Eric N. Stravitz & the STRAVITZ LAW FIRM, P.C. and EISENBERG & BAUM, LLP, for her Complaint against Defendants, ANNE ARUNDEL MEDICAL CENTER, INC., ANNE ARUDNEL MEDICAL CENTER COLLABORATIVE CARE NETWORK, LLC, and ANNE ARUNDEL MEDICAL CENTER FOUNDATION, INC., hereby alleges as follows:

---

[1] All Defendants share the same address and Resident Agent.

**PRELIMINARY STATEMENT**

1. Plaintiff is a deaf individual who communicates primarily in American Sign Language ("ASL"), which is her expressed, preferred, and most effective means of communication. In 2015, Plaintiff sought medical treatment from ANNE ARUNDEL MEDICAL CENTER ("AAMC"). During Plaintiff's medical treatment at Defendants' hospital, Defendants discriminated against her by failing and/or refusing to provide auxiliary aids and services to accommodate her disability, despite Plaintiff's repeated requests for effective communication.

2. Lip-reading, the ability to understand the speech of another by watching the speaker's lips, does not provide effective communication for most deaf and hard of hearing individuals. In fact, the upper limits of estimates for lip-reading accuracy, in an ideal one-on-one situation, have been as low as 10% to 30% of correct words. This is because only a small amount of the spoken sounds of aural language are visible, and many of those appear identical on the lips. Even if a primary ASL user were able to determine the sounds appearing on a speaker's lips, he or she would still not necessarily understand the English language or the speaker's vocabulary, because many deaf individuals, including Plaintiff, have difficulty acquiring and communicating in English. Despite this, Defendants often forced Plaintiff to communicate in a medical setting using this unreliable and ineffective method, instead of properly accommodating her disability through qualified ASL interpreters.

3. Video Remote Interpreting (VRI) is a videotelecommunication service that uses devices such as web cameras or videophones to provide sign language or spoken language interpreting services through a remote or offsite interpreter. VRI is inappropriate in many circumstances, including when the deaf user has other conditions that impair the deaf user's ability to use the device (i.e., if the deaf user has a visual impairment, is in a lot of pain, or

cannot achieve the proper posture); when there are many people in a room; when staff is inadequately trained to set up or operate the device; or in situations that are especially complicated or emergent. Despite this, Defendants often forced Plaintiff to use a nonfunctioning VRI, or to use VRI when it was not appropriate to do so, instead of properly accommodating her disability.

4. Plaintiff brings this action to compel Defendants to cease unlawful discriminatory practices and implement policies and procedures that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity to participate in and benefit from Defendants' health care services. Plaintiff seeks declaratory, injunctive, and equitable relief; compensatory and punitive damages; and attorneys' fees and costs to redress Defendants' unlawful discrimination on the basis of disability in violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), 42 USC § 18116.

## THE PARTIES

5. Plaintiff NAOMI SHENEMAN brings this action and is an individual residing in Rochester, NY. Naomi Sheneman is a profoundly deaf individual who primarily communicates in American Sign Language, and she is substantially limited in the major life activities of hearing and speaking within the meaning of federal anti-discrimination laws.

6. Defendant ANNE ARUNDEL MEDICAL CENTER COLLABORATIVE CARE NETWORK, LLC, at all times hereinafter mentioned, is a corporation that has been licensed and doing business in Maryland with a principal place of business at 2001 Medical Parkway, Annapolis, MD 20401. Defendant owns, leases, and/or operates Anne Arundel Medical Center, a

hospital located at 2001 Medical Parkway, Annapolis, MD 20401. Defendant is a place of public accommodation under federal and state antidiscrimination laws and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements, thus making Defendant subject to the requirements of Title III of the ADA, Section 504 of the Rehabilitation Act, and Section 1557 of the Patient Protection and Affordable Care Act.

7. Defendant ANNE ARUNDEL MEDICAL CENTER FOUNDATION, INC., at all times hereinafter mentioned, is a corporation that has been licensed and doing business in Maryland with a principal place of business at 2001 Medical Parkway, Annapolis, MD 21401. Defendant owns, leases, and/or operates Anne Arundel Medical Center, a hospital located at 2001 Medical Parkway, Annapolis, MD 21401. Defendant is a place of public accommodation under federal and state antidiscrimination laws and is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements, thus making Defendant subject to the requirements of Title III of the ADA, Section 504 of the Rehabilitation Act, and Section 1557 of the Patient Protection and Affordable Care Act.

## JURISDICTION & VENUE

8. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiffs' claims arising under federal law, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiffs' claims arising under state law.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the Defendants reside within the jurisdiction of this district, and a substantial part of the events that give rise to the claims occurred in this district.

## STATEMENT OF FACTS

10. Naomi Sheneman is a profoundly deaf individual who communicates primarily through American Sign Language (ASL).

11. On or about January 21, 2015, Ms. Sheneman and her partner attended an appointment with Dr. Teresa Diaz-Montes at the The Gynecologic Oncology Center at the Anne Arundel Medical Center.

12. Ms. Sheneman's partner is deaf.

13. At the inception of the January 21, 2015 appointment, a nurse tried to set up a VRI machine but was unable to do so.

14. Although the VRI was not functioning and without the aid of an interpreter, Dr. Diaz-Montes proceeded with the appointment.

15. Due to the absence of an interpreter and the malfunction of the VRI, Dr. Diaz-Montes relied upon Ms. Sheneman's deaf partner to interpret for Ms. Sheneman by reading lips.

16. Ms. Sheneman's partner was not able to read Dr. Diaz-Montes' lips due to her Spanish accent, but he was able to grasp some of what the nurse, Jill, said. The appointment then proceeded by Dr. Diaz-Montes speaking to the nurse, who would then speak to Ms. Sheneman's partner, who then signed in ASL to Ms. Sheneman.

17. Without the aid of a qualified interpreter, communication was ineffective as Ms. Sheneman was unable to fully understand the conversation or to participate in it.

18. Ms. Sheneman was significantly upset that the appointment proceeded without the aid of an interpreter or VRI; she was terrified that she discussed a diagnosis and treatment by the relay manner in which the conversation was held as this form of communication was far from effective.

19. On or about October 8, 2015, Ms. Sheneman learned she would need surgery; on that same day, surgery was scheduled for October 12, 2015 at AAMC.

20. At the time the surgery was scheduled, Ms. Sheneman asked her doctor's office to

request a sign language interpreter on her behalf from AAMC. Ms. Sheneman's doctor's office confirmed that they requested a sign language interpreter for her surgery at AAMC.

21. However, on or about October 9, 2015, AAMC staff contacted Ms. Sheneman to discuss the logistics for the surgery. During this conversation, AAMC staff asked Ms. Sheneman if she was going to bring a sign language interpreter with her to the scheduled surgery.

22. In response, Ms. Sheneman informed AAMC staff that she was not going to bring a sign language interpreter with her because it was AAMC's responsibility to provide her with one.

23. AAMC staff then stated that they would work on providing Ms. Sheneman with a sign language interpreter. Later that same day, Ms. Sheneman called AAMC to confirm that the hospital would, in fact, provide a sign language interpreter for her and was told that the hospital would do so.

24. However, when Ms. Sheneman arrived at AAMC on October 12, 2015 for her scheduled surgery, AAMC informed her that the hospital did not have a sign language interpreter for her.

25. Instead, AAMC staff asked if Ms. Sheneman's friend would act as an interpreter between Ms. Sheneman and AAMC medical staff. Both Ms. Sheneman and her companion stated that he would not.

26. After this exchange, AAMC staff communicated with Ms. Sheneman via written notes in order to complete her registration.

27. Once her registration was complete, Ms. Sheneman was taken to pre-op, where she was informed by an AAMC nurse that they did not have an interpreter for her.

28. Without an interpreter present, the AAMC nurse proceeded to speak to Ms.

Sheneman, asking Ms. Sheneman questions about her health and forcing Ms. Sheneman to read her lips and to respond to her questions by writing and using gestures.

29. After the first few questions, Ms. Sheneman could not understand the AAMC nurse and asked that she write her questions to Ms. Sheneman rather than speak them.

30. The AAMC nurse denied Ms. Sheneman's request, responding, in sum and substance, that Ms. Sheneman could understand her and continued her attempt to communicate with Ms. Sheneman by speaking to her.

31. Ms. Sheneman was unable to read the AAMC nurse's lips and repeatedly asked the AAMC nurse to write her questions as Ms. Sheneman could not understand the questions the nurse asked orally.

32. Without an interpreter, communication was ineffective as Ms. Sheneman was unable to fully understand the questions the nurse posed to her.

33. Frustrated and upset by this exchange, Ms. Sheneman again requested an in-person sign language interpreter.

34. Instead of providing Ms. Sheneman with an in-person sign language interpreter, the AAMC nurse informed Ms. Sheneman that AAMC would use VRI to communicate with her about the surgery and preparations, would then disconnect the VRI and reconnect later, when the surgeon and anesthesiologist were available.

35. Ms. Sheneman informed the AAMC nurse that if an in-person sign language interpreter was not available, she would like to stay connected to the VRI for the duration of her time in pre-op.

36. The AAMC nurse refused Ms. Sheneman's request to stay connected to VRI for the duration of her time in pre-op.

37. During her time in pre-op, an AAMC physician assistant attempted to connect Ms. Sheneman to intravenous fluids. While the VRI device was connected at that time, the physician assistant stood between Ms. Sheneman and the VRI screen so that the both Ms. Sheneman's and the VRI interpreter's view was blocked.

38. Ms. Sheneman attempted to inform the physician assistant on how best to insert the needle to connect her to the intravenous fluids; however, because she could not see the VRI interpreter Ms. Sheneman's attempts to instruct the physician assistant were not interpreted.

39. As a result, the physician assistant struggled to insert the needle into Ms. Sheneman's arm, was ultimately unable to do so, caused Ms. Sheneman pain, and left her with a foul bruise.

40. After AAMC staff completed prepping her for surgery, staff disconnected the VRI device.

41. Sometime thereafter, the AAMC surgeon arrived to discuss the surgery with Ms. Sheneman. The AAMC nurse struggled to reconnect the VRI device, causing the surgeon to leave while the AAMC nurse completed the connection.

42. When the surgeon returned, although the VRI device was now connected, Ms. Sheneman could not see the VRI screen because AAMC staff had completed prepping her for surgery in a supine position.

43. The AAMC nurse attempted to adjust the VRI device screen; however, she was unsuccessful.

44. In order to use the VRI device, an AAMC nurse had to pull Ms. Sheneman into a seated position and then hold her upright while she attempted to communicate with the surgeon and anesthesiologist.

45. Ms. Sheneman attempted to inform the anesthesiologist that she suffered from post-operation nausea and vomiting; however, upon information and belief, her attempt was unsuccessful as Ms. Sheneman vomited for thirty-six hours post-surgery.

46. After the surgeon and anesthesiologist left, the AAMC nurse disconnected the VRI device and informed Ms. Sheneman that the VRI device would not be available to her for the rest of the day.

47. Ms. Sheneman then inquired whether AAMC would provide her with an in-person interpreter, as per her request; the AAMC nurse informed her the hospital would not.

48. Shortly thereafter, an operating room nurse arrived and attempted to communicate with Ms. Sheneman.

49. Without the VRI device or an in-person interpreter, the operating room nurse attempted to communicate with Ms. Sheneman via writing, while Ms. Sheneman was in a supine position.

50. When Ms. Sheneman awoke from surgery, she found a dry-erase board sitting on her abdomen. When Ms. Sheneman looked to an AAMC nurse present in the room, the nurse pointed to the dry-erase board.

51. Having just awoken from surgery, Ms. Sheneman was groggy and fuzzy and had a difficult time focusing on what was written on the dry-erase board.

52. Ms. Sheneman's surgeon arrived and attempted to communicate with Ms. Sheneman by speaking to her.

53. Without an interpreter or VRI device, Ms. Sheneman could not understand what her surgeon was attempting to communicate.

54. Unable to communicate with Ms. Sheneman, the surgeon wrote a few words on a

piece of paper and left.

55. Ms. Sheneman wanted to speak with her surgeon about the surgery; however, without an interpreter or VRI device, Ms. Sheneman was unable to ask her surgeon questions or engage in any sort of dialogue.

56. Thereafter, AAMC staff moved Ms. Sheneman into post-operative recovery, where she began to vomit.

57. Without an interpreter or VRI device, the AAMC nurse could not communicate with Ms. Sheneman and instead, without explanation, began to change Ms. Sheneman into her clothing, while Ms. Sheneman was vomiting.

58. Ms. Sheneman attempted to tell the AAMC nurse that she was not prepared to go home, that she had questions about her vomiting and post-operative care instructions, and that she felt extremely nauseous from all the movement; however, without an interpreter or VRI device, communication was ineffective.

59. As a result of the insufficient access to interpreters and VRI devices, and staff's reliance and use of written notes in English while Ms. Sheneman was in a supine position and post-operative state, Ms. Sheneman had a delayed and inadequate understanding of her condition, the treatments and medications she received, and of her follow-up care instructions.

60. In most instances, effective communication could not have taken place without the aid of a qualified ASL interpreter.

61. As a result of AAMC's failure to provide Ms. Sheneman with sufficient access to ASL interpreters and to effective auxiliary aids and services, she was forced to repeatedly advocate for her right to effective communication while being prepped for surgery. During an already stressful and fearful time, AAMC's failure to provide Ms. Sheneman with sufficient

access to interpreters and to effective auxiliary aids and services caused Ms. Sheneman to experience fear, anxiety, indignity, humiliation, and/or emotional distress.

62. Defendants knew or should have known of their obligations under the ADA and Section 504 of the Rehabilitation Act to provide accommodations to individuals with disabilities, including individuals who are deaf or hard of hearing, and to develop policies to promote compliance with these statutes.

63. Defendants and their physicians and staff knew or should have known that their actions and/or inactions created an unreasonable risk of causing Plaintiff greater levels of fear, anxiety, indignity, humiliation, and/or emotional distress than a hearing person or companion would be expected to experience.

64. Defendants and their physicians and staff failed to assess the communication abilities and needs of Plaintiff.

65. As a result of Defendants' failure to ensure effective communication with Plaintiff, Plaintiff received services that were objectively inferior to those provided to hearing individuals.

66. As a result of Defendants' failure to ensure effective communication with Plaintiff, Plaintiff was deprived of her right to understand her treatment, the outcome of her surgery, her discharge instructions, and to provide informed consent.

67. Defendants' wrongful and intentional discrimination against Plaintiff on the basis of disability is reflected by the Defendants' failure to train employees and promulgate policies of non-discrimination against deaf individuals.

68. Defendants discriminated against Plaintiff with deliberate indifference to her communication needs, causing her to endure humiliation, fear, anxiety, and emotional distress.

69. Plaintiff would seek for herself Defendants' healthcare services in the future, whether by choice or necessity, due to the proximity of Defendants' medical facilities to her home; but she is deterred from doing so due to the discrimination she faced and expects to face in the future.

## CLAIM 1: VIOLATIONS OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT

70. Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

71. At all times relevant to this action, Title III of the ADA, 42 U.S.C. § 12181, et seq., has been in full force and effect and has applied to Defendants' conduct.

72. At all times relevant to this action, the United States Department of Justice regulations implementing Title III of the ADA, 28 C.F.R. Part 36, have been in full force and effect and have applied to Defendants' conduct.

73. At all times relevant to this action, Plaintiff has been substantially limited in the major life activities of hearing and speaking, and is an individual with a disability within the meaning of the ADA, 42 U.S.C. § 12102(2).

74. Defendants own, lease, and/or operate a place of public accommodation within the meaning of Title III of the ADA, 42 U.S.C. § 12181(7)(D).

75. Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

76. Title III of the ADA defines discrimination to include denying participation or

offering an unequal or separate benefit to individuals with disabilities. 42 U.S.C. § 12182(b)(1)(A).

77. Title III of the ADA further defines discrimination to include "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services." 42 U.S.C. § 12182(b)(2)(A)(iii).

78. Federal regulations implementing Title III of the ADA provide that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c).

79. Federal regulations implementing Title III of the ADA provide that when a public accommodation provides VRI service, it must ensure that the service includes all the following criteria: "(1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; (2) A sharply delineated image that is large enough to display the interpreter´s face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position; (3) A clear, audible transmission of voices; and (4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI." 28 C.F.R. § 36.303(f).

80. Defendants discriminated against Plaintiff, on the basis of disability, in violation of Title III of the ADA and its implementing regulations.

81. On information and belief, the use of VRI before onsite, in-person interpreter services is the result of a policy or practice of Defendants to prohibit or impede the use of onsite,

qualified sign language interpreters without regard to whether other methods will provide effective communication.

82. As set out above, absent injunctive relief there is a clear risk that Defendants' actions will recur with Plaintiff and/or other deaf persons.

83. Plaintiff is therefore entitled to injunctive relief, as well as an award of attorneys' fees, costs, and disbursements pursuant to the ADA, 42 U.S.C. § 12188(a)(1), and/or common law.

### **CLAIM 2: VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT**

84. Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

85. At all times relevant to this action, Section 504 of the Rehabilitation, 29 U.S.C. § 794, has been in full force and effect and has applied to Defendants' conduct.

86. At all times relevant to this action, the United States Department of Health and Human Services ("HHS") regulations implementing Section 504 of the Rehabilitation Act, 45 C.F.R. Part 84, have been in full force and effect and have applied to Defendants' conduct.

87. At all times relevant to this action, Plaintiff has had substantial limitations to the major life activities of hearing and speaking, and has been an individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9).

88. At all times relevant to this action, Defendants have been a program or activity receiving federal financial assistance pursuant to 29 U.S.C. § 794(b).

89. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

90. Defendants discriminated against Plaintiff, solely on the basis of disability, by denying her meaningful access to the services, programs, and benefits the Defendants offer to other individuals, and by refusing to provide auxiliary aids and services necessary to ensure effective communication, in violation of 29 U.S.C. § 794.

91. As set out above, absent injunctive relief there is a clear risk that Defendants' actions will recur with Plaintiff and/or additional deaf persons.

92. Plaintiff is therefore entitled to seek and recover compensatory damages for the injuries and loss she sustained as a result of Defendants' discriminatory conduct and deliberate indifference as hereinbefore alleged, pursuant to 29 U.S.C. § 794(a).

93. Plaintiff is further entitled to an award of attorneys' fees, costs, and disbursements pursuant to the Rehabilitation Act, 29 U.S.C. § 794(a) and/or common law.

### CLAIM 3: VIOLATIONS OF SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

94. Plaintiff repeats and reiterates every allegation set forth in the foregoing paragraphs of this Complaint with the same force and effect as if more fully set forth at length herein.

95. At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), 42 USC § 18116 was in full force and effect and applied to the Defendants' conduct.

96. At all times relevant to this action, Section 1557, 42 USC § 18116, incorporated the definition of disability in the Rehabilitation Act, 29 U.S.C. § 705(9).

97. At all times relevant to this action, Plaintiff had substantial limitations to the major life activity of hearing and speaking, and was an individual with disabilities within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9) and of Section 1557, 42 USC § 18116.

98. At all times relevant to this action, Plaintiff's primary language for communication was American Sign Language and not English; and Plaintiff had limited ability to read, write, speak, or understand English, and was an individual with limited English proficiency within the meaning of Section 1557, 45 C.F.R. § 92.4.

99. At all times relevant to this action, Defendants received federal financial assistance, including Medicaid reimbursements, and were principally engaged in the business of providing health care. Therefore, Defendants' hospital is a health program or activity receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

100. Pursuant to Section 1557, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . ." 42 USC § 18116.

101. Defendants have discriminated against Plaintiff solely on the basis of her disability and her limited English proficiency by denying her meaningful access to the services, programs, and benefits the Defendants offer to other individuals by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 1157, 42 U.S.C. § 18116.

102. Defendants discriminated against Plaintiff by failing to ensure effective communication through the providing of qualified sign language interpreters on-site and/or through VRI machines that worked.

103. On information and belief, the refusal to offer on-site ASL interpreter services is as a result of a policy or practice of Defendants to prohibit or impede the use of on-site qualified sign language interpreters without regard to whether VRI services will provide effective communication.

104. As set out above, absent injunctive relief there is a clear risk that Defendants' actions will recur again with Plaintiff and other Deaf patients and family members.

105. Plaintiff is therefore entitled to seek and recover compensatory damages for the injuries and loss she sustained as a result of Defendants' discriminatory conduct and deliberate indifference as hereinbefore alleged, pursuant to 42 U.S.C. § 18116(a).

106. Plaintiff is further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 18116(a), the Rehabilitation Act, 29 U.S.C. § 794(a) and/or common law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Court grant the following relief:

a. Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have subjected Plaintiff to unlawful discrimination in violation of Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Section 1557 of the Patient Protection and Affordable Care Act;

b. Enjoin Defendants from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals meaningful access to and full and equal enjoyment of Defendants' facilities, services or programs;

c. Order Defendants:

i. to develop, implement, promulgate, and comply with a policy prohibiting future discrimination against Plaintiff or other deaf or hard of hearing individuals by failing to provide effective communication;

ii. to develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an on-site, in-person interpreter for effective communication, one will be provided as soon as practicable in all services offered by Defendants;

iii. to develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly worded notices that Defendants will provide sign language interpreters, videophones, and other communication services to ensure effective communication with deaf or hard of hearing persons;

iv. to develop, implement, promulgate, and comply with a policy to ensure, in the event the Defendants use a Video Remote Interpreting System ("VRI"), that such system has a high-speed Internet connection; a video screen with appropriate size, position, capture angle, focus, and proximity to the deaf individual; and appropriate audio quality. When possible, the equipment should be portable and made available to the patient where the patient is located, preferably in a private room to minimize distractions and maintain confidentiality;

v. to develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing patients are able to communicate through the most

        appropriate method under the circumstances, recognizing that the VRI is not appropriate in all medical situations;

    vi. to create and maintain a list of American Sign Language interpreters and ensure availability of such interpreters at any time of day or night;

    vii. to train all their employees, staffs, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the ADA, Section 504 of the Rehabilitation Act, and Section 1557 of the Patient Protection and Affordable Care Act;

    viii. to train all their employees, staffs, and other agents on a regular basis about Defendants' policies regarding how to properly use VRI services (including how to set up the VRI system and how to obtain technical assistance in case of system malfunction or failure) and how to obtain interpreters when reasonably requested by deaf or hard of hearing patients;

d. Award to Plaintiff:

    i. Compensatory damages pursuant to Section 504 of the Rehabilitation Act and Section 1557 of the Patient Protection and Affordable Care Act;

    ii. Reasonable costs and attorneys' fees pursuant to the ADA, Section 504 of the Rehabilitation Act, and Section 1557 of the Patient Protection and Affordable Care Act;

    iii. Interest on all amounts at the highest rates and from the earliest dates allowed by law;

    iv. Any and all other relief that this Court finds necessary and appropriate.

Respectfully submitted,

STRAVITZ LAW FIRM, PC

By: /s/ Eric N. Stravitz
Eric N. Stravitz (Bar No. 23610)
4300 Forbes Boulevard
Suite 100
Lanham, MD 20706
O: (240) 467-5741
F: (240) 467-5743
E: eric@stravitzlawfirm.com
*Counsel for Plaintiff*

OF COUNSEL

Eric M. Baum, Esq.
Andrew Rozynski, Esq.
EISENBERG AND BAUM, LLP
24 Union Square East, Fourth Floor
New York, NY 10003
(212) 353-8700
ebaum@EandBlaw.com
arozynski@EandBlaw.com

## **JURY DEMAND**

Plaintiff demands trial by jury for all of the issues a jury properly may decide, and for all of the requested relief that a jury may award.

/s/ Eric N. Stravitz
Eric N. Stravitz (Bar No. 23610)